UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ASHTON A. SMITH,

          Plaintiff,

v.

JOHN DAVIDS, *et al.*,

          Defendants.

_____/

Case No. 1:19-cv-402

Hon. Paul L. Maloney

## REPORT AND RECOMMENDATION

This is a *pro se* civil rights action brought by Ashton Smith (sometimes referred to as "Smith"), a prisoner in the custody of the Michigan Department of Corrections (MDOC).  As discussed in detail in a previous order, Smith's lawsuit alleged that two nurses, defendants R.N. Corinne Spear and R.N. James Leland, violated his Eighth Amendment rights by failing to treat an eye infection between August 11, 2018 and August 15, 2018.  *See* Order (ECF No. 95, PageID.621-625).[1]

Smith's allegations are summarized as follows.  Smith had a history of ocular disease which included corneal transplants.  First Amend. Compl. (ECF No. 26, PageID.210-211).  Sometime before August 11, 2018, with the help of his "anatomical (medical reference book) and the Medical information/warning from Ophthalmologist Dr. C. Hood, M.D.", Smith "knew he had an eye infection & Corneal ulcer." *Id*. at PageID.210.  Between August 11, 2018 and August 15, 2018, Smith informed defendants R.N. Spear and R.N. Leland "on several occasions that [he]

---

[1] The Court ascertained Smiths' claims after reviewing his various efforts to file and withdraw amended complaints. *See* Opinion (ECF No. 5, PageID.47-49), Smith's (First) amended complaint (ECF No. 26, PageID.211-214), and a Stipulation and Order (ECF No. 29).

*possibly* has a Staph infection and Corneal Ulcer." *Id*. (emphasis added).  For more than three days, although Smith showed defendants that he was in serious need of emergency medical care and told them that he had corneal transplants, "both Nurses failed to properly act and did not provide basic fundamental help to prevent [or] correct [his] serious medical need. *Id*. Specifically, Smith told defendants that according to the eye doctor, if he had even the slightest sign of infection, he was to alert the healthcare personnel as soon as possible because an infection of a corneal transplant has a high risk of causing partial blindness, total blindness, or complete loss of the eye. *Id*. at PageID.210-211.

Smith provided the following chronology.  On August 11, 2018, he woke up "with his right eye stuck shut from the infectious discharge."  Sometime that day, Smith informed defendants of his situation when he visited the medication line.  *Id*. at PageID.211.  Defendants examined the red swollen eye, but refused to provide any medical care.  *Id*.

On August 12th and 13th, the infection became worse with pain, puss discharge and a white cloudy mass beginning to form over the cornea obscuring Smith's  vision.  *Id*. Sometime that day, while visiting the medication line, Smith showed his eye to defendants and requested medical help.  *Id*.  However, defendants only observed and refused to assist or render aid. *Id.* at PageID.211-212.  As a result, plaintiff developed a staph infection in his right eye which developed into a corneal ulcer "due to the untimely health care response by the defendant [sic] inactions and lack of immediate medical treatment as repeatedly requested."  *Id.* at PageID.211.

On August 14, 2018, plaintiff's right eye was glued shut due to the infection, at which time he suffered pain, disorientation and vertigo secondary to the infection.  *Id*. at PageID.212.  On that date, his eye was purple-red with a "thick solid mass" covering part of his

cornea.  Sometime that day, when Smith visited the medication line, defendants observed his condition but refused to render aid.  *Id*.

By August 15th, Smith's eye was further degraded to the point he could see only shadows.  *Id*. An unidentified corrections officer saw Smith's eye, alerted his supervisor, and demanded that health care see Smith.  *Id*. at PageID.214.  An unidentified doctor ("jane doe") determined that Smith's condition was an emergency and had plaintiff transported to the corneal specialist, Dr. C. Hood.  *Id*.  Smith was placed on antibiotics and treated at the Duane Waters State Hospital for two months.  *Id*.  Smith stated that he was diagnosed with "a Corneal ulceration due to the prolonged untreated Staph infection in the right eye."  *Id*.

Smith alleged that defendants refused to help him because in July, 2018, when Smith cut in line to refuse medication, he engaged in a verbal confrontation with, and made disrespectful comments to, defendants' co-worker Nurse Page.  *Id*. at PageID.209, 212.  According to Smith, weeks after that confrontation, R.N. Leland made statements such as "Just because your eye looks angry, that don't make you special," "you better get off Page's shitlist", "Damn it looks worse than yesterday . . . Good!, should not have call [sic] nurse Page a bitch." *Id*. at PageID.212-213.  Leland also laughed at Smith stating "that eye is going to fall out any minute now!".  *Id*. at PageID.213.  Defendant Spear made similar comments such as "I don't care if your eye falls out, you should not have disrespected Nurse Page," "[u]ntil you apologize, were [sic] not treating your eye so good luck," and "[f]ind someone else to give you help."  *Id*.

Smith set out two counts.  In Count I, Smith alleged that defendants were deliberately indifferent to a serious medical need in violation of the 8th Amendment.  In Count II, Smith alleged that defendants treated him with gross negligence and committed medical

malpractice.  *Id*. at PageID.215-217.  Plaintiff seeks compensatory and punitive damages in excess of $1,650,000.00.  *Id*. at PageID.218.

## II.    Defendants' motion for summary judgment

### A.    Legal standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Rule 56 further provides that a party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the parties' burden of proof in a motion for summary judgment:

> The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case.  Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Copeland*, 57 F.3d  at 478-79 (citations omitted).  "In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party."  *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).  However, the Court is not bound to blindly adopt a non-moving party's version of the facts.  "When opposing parties

tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### B.    8th Amendment claim

### 1.    Legal standard

Smith seeks relief pursuant to 42 U.S.C. § 1983, which "provides a civil cause of action for individuals who are deprived of any rights, privileges, or immunities secured by the Constitution or federal laws by those acting under color of state law." *Smith v. City of Salem, Ohio*, 378 F.3d 566, 576 (6th Cir. 2004). To state a § 1983 claim, a plaintiff must allege two elements: (1) a deprivation of rights secured by the Constitution and laws of the United States, and (2) that the defendant deprived him of this federal right under color of law. *Jones v. Duncan*, 840 F.2d 359, 360-61 (6th Cir. 1988); 42 U.S.C. § 1983.

Here, Smith alleged that defendants violated his rights under the 8th Amendment by being deliberately indifferent to his serious medical needs. It is well established that an inmate has a cause of action under § l983 against prison officials for "deliberate indifference" to his serious medical needs, since the same constitutes cruel and unusual punishment proscribed by the 8th Amendment. *Estelle v. Gamble*, 429 U.S. 97 (l976). A viable 8th Amendment claim consists of an objective and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). A court considering such a claim must ask both if the alleged wrongdoing was objectively harmful enough to establish a constitutional violation and if the officials acted with a sufficiently culpable state of mind. *Hudson v. McMillian*, 503 U.S. 1, 8 (1992).

The objective component requires the infliction of serious pain or failure to treat a serious medical condition. *Id*. at 8-9. "Because society does not expect that prisoners will have

unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Id.* at 9.

The subjective component requires that the defendant act with deliberate indifference to an inmate's health or safety. *See Wilson v. Seiter*, 501 U.S. 294, 302-03 (1991). To establish the subjective component, the plaintiff must show that "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. Mere negligence in diagnosing or treating a medical condition does not constitute an 8th Amendment violation. *Id.* at 835. "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause." *Whitley v. Albers*, 475 U.S. 312, 319 (1986). Stated another way, the plaintiff must prove that each defendant acted with a "sufficiently culpable state of mind, equivalent to criminal recklessness." *Santiago v. Ringle*, 734, F.3d 585, 591 (6th Cir. 2013) (citing *Farmer*, 511 U.S. at 834, 839-40) (internal quotation marks omitted).

### 2.    Discussion

Defendants seek summary judgment because there is no genuine issue of material fact to support plaintiff's 8th Amendment claims against them. In her affidavit, R.N. Spear stated that, as reflected in the electronic medical record, she did not assess plaintiff in a clinic setting from August 11 through August 15, 2018. *See* Affidavit of R.N. Corinne Spear (ECF No. 90-3, PageID.569). During that time frame, R.N. Spear worked the I-Unit medication line on one day, August 13, 2018, and saw Smith two times. *Id.* According to Spear, "Smith did not make me aware he needed to be assessed or treated while in the I-unit medication line." *Id.*

Contrary to Smith's allegations, there is no evidence that R.N. Spear worked on the other dates.  In addition, neither R.N. Spear nor R.N. Leland worked on August 14th, the date that Smith claims that defendants refused to render aid when they observed that his eye was "purple-red" with a "thick solid mass" covering part the cornea.  *See* discussion, *infra*.  While Smith refers to events which occurred on August 15, 2018, defendants were not involved in those events.  *Id*.

R.N. Spear explained her position:

As an R.N. for MDOC, my duties include assessment of inmates and administer [sic] medications as prescribed by the provider. I do not diagnose prisoners. As a nurse in the I-unit medication line, it is not my duty to provide medical care to Smith, or any prisoner, outside of medication distribution. As a medication line nursing staff, I would not normally know a prisoner's medical history as the confidential medical records are kept in the health services clinic.

*Id*.  R.N. Spear further explained:

Contact between staff and prisoners in the I-unit medication line is not an appointment for general health care services; the medication line is not where prisoners are assessed or treated, rather it is limited to distributing medication to the prisoner. In the medication line, dozens of prisoners' [sic] lineup, waiting for staff to distribute their medication through a small window; the line is intended to move swiftly, as there are many prisoners typically needing medication distributed. There is a lack of privacy, and the I-unit medication line does not afford staff the opportunity to spend time with inmates, assess their medical needs, or address any issues they may be having, beyond directing them to health care. Staff working the I-unit medication line do not have prisoner's health care records readily accessible. Deviations in routine process of the I-unit medication line, could create a safety and security risk in the facility, as it would divert staff's attention and slow down medication distribution.

*Id*. at PageID.569-570.

R.N. Spear explained the normal procedure for requesting medical assistance,

Outside of medical emergencies, where care is provided to prisoners on an emergent basis at all times within the facility, prisoners may access general health care services for assessment and/or treatment simply by "kite" or by the prisoner submitting a Health Care Request (CHJ-549), as health care is staffed and open 5:30 a.m. to 10:00 p.m. every day including weekends and holidays.

*Id*. at PageID.570. [2]

The photographs of the medication line depict a window, with bars, mesh and what appears to be an opening to dispense medication. *See* Photographs (ECF No. 90-6, PageID.595-596. The photographs illustrate R.N. Spear's statement that "the medication line does not afford staff the opportunity to spend time with inmates, assess their medical needs, or address any issues they may be having, beyond directing them to health care."

Finally, R.N. Spear stated that "I never made any of the alleged statements to Smith, nor do I recall any of the conversations he alleges", that "I had no knowledge of any incident or ticket between LPN Page and Smith[] nor was I privy to such a conversation and had no knowledge of it", and that "I was unaware that Smith had an altercation with LPN Page." Spear Aff. at PageID.570.

Similarly, in his affidavit, R.N. Leland stated that he does not diagnose prisoners, that as a nurse in the I-unit medication line it is not his duty to provide medical care to any prisoner "outside of medication distribution" and that "I would not normally know a prisoner's medical history as the confidential medical records are kept in the health services clinic." R.N. James Leland Affidavit (ECF No. 90-4, PageID.574). R.N. Leland stated that during the relevant time period of August 11, 2018 through August 15, 2018, he worked the I-unit medication line on August 11th, 12th, and 13th, and saw Smith three times over those dates. *Id*. R.N. Leland had the same duties and limited interaction with prisoners on the medication line as R.N. Spear. *Id*. at

---

[2] *See* MDOC Policy Directive 03.04.100 at ¶ NN (eff. Feb. 15, 2015):

"Prisoners shall submit a Health Care Request (CHJ-549) to request routine health care services, including reassessment of the need for an assistive device or other service provided the prisoner to meet his/her medical needs. Housing unit staff shall assist illiterate prisoners and others who are unable to complete the form. A locked container shall be provided which is easily accessible to all general population prisoners in which they can place the form; these containers shall be opened only by health care staff. Health care staff shall collect the forms at least daily; the date and time of receipt of each form and presenting complaint shall be documented in the prisoner's health record."

PageID.574-575.  Like R.N. Spear, Leland stated that he had no knowledge of any incident between LPN Page and Smith, and "never made any of the alleged statements to Smith."  *Id*. at PageID.575.

The record reflects that when Smith wanted something from health care, he knew how to get it.  For example, on August 8, 2018, a few days before the alleged incidents, plaintiff sent a kite to health care stating that he had a corneal transplant a few months ago and needed a re-fill of steroid drops and a sterile solution, complained that health care refused to give him his "scoleral contacts" and stated that "I need my steril [sic] solutions".  Kite (ECF No. 90-5, PageID.578).  Health care responded the next morning advising Smith that "[y]ou may request an appointment if you wish to be added to call-out to discuss this issue with provider, rekite stating so."  *Id*.  As discussed, *supra*, Smith's interaction with prison health care also included a history of refusing medication.  *See* Administrative Note (Aug. 14, 2019) (ordering a chart review because Smith had refused 25 doses of medication (Wellbutrin)) (ECF No. 90-5, PageID.579).

Medical records reflect that Smith had a medical emergency on August 15, 2018.  Smith reported that he woke up with acute vision loss, and ultimately was seen off-site for treatment at a corneal transplant clinic.  MDOC Consultation (ECF No. 90-5, PageID.580).  Contrary to Smith's allegations, medical records reflect that he was not desperate for medical attention; in fact, he refused it.  Nursing referred Smith to Suzanne M. Howard, M.D. for a complaint of "sudden vision loss in Right eye" and reporting "shadows only" out of that eye.  *Id*. (Addendum) at PageID.582.  Health care staff obtained approval for urgent treatment at the Kellogg Eye Center, and made an appointment for 2:15 p.m. that day.  *Id*.  When the matter was explained to Smith, he initially *refused*.  *Id*.  Smith ultimately agreed to the treatment, but only after the MDOC processed paperwork to memorialize his refusal of medical treatment.  *Id*.  *See*

MDOC Release from responsibility for medical, surgical, psychiatric and other treatment (August 15, 2018 at 9:57 a.m.) (ECF No. 90-5, PageID.585) (stating in pertinent part: "Inmate is refusing an emergent appointment today at Kellogg Eye Center at U of M for vision loss in Right eye" at 2:15 p.m., and that "[d]espite encouragement to accept treatment as described above, the patient has refused recommended care for this condition.").

Smith was called to health care, where he met R.N. Mulnix at 10:10 a.m. Clinical Progress Note (ECF No. 90-5, PageID.587). Smith refused to go for treatment because he had legal work and expressed that his need to meet a filing deadline was more important than the medical appointment. *Id*. R.N. Mulnix noted that Smith "[w]ould not accept that his priorities were backwards that he may end up going home blind if he doesn't take care of his medical needs with his eyes." *Id*.

Ultimately, Smith agreed to go for emergency treatment off-site. Upon his return at 10:24 p.m., Smith reported that the doctor took a suture out of his eye, that he does not trust health care, that he would not take eye drops (antibiotics) "from that big guy who looks like Kim Jung Ill", and that he would not give himself the eye drops that night advising health care that "I would probably skip a dose or two." Nurse Protocol (ECF No. 90-5, PageID.590).

At his deposition, Smith testified that when his eye symptoms started, defendants refused him access to medical treatment and retaliated against him because he had a "verbal altercation and cussed out their friend Nurse Page." Ashton Smith Dep. (ECF No. 90-2, PageID.553). Notwithstanding the fact that defendants were nurses assigned to the medication line, Smith felt that they were negligent in not sending him to the University of Michigan Kellogg Eye Center "because their job as a *physician* is to do no harm first and foremost and by them being negligent and not sending me to the eye center in the appropriate time at that moment when I first

10

start exhibiting symptoms of corneal ulcer and staph infection."  *Id*. at PageID.554 (emphasis

added).  Smith stated that R.N. Leland knew he had corneal transplants and an eye disease called

keratoconus.  *Id*. at PageID.555.  Smith continued,

> They knew my eyes was in bad shape and it was placed in my medical file by
> Doctor Hood, the ophthalmologist at the University of Michigan Kellogg's Eye
> Center, that if I exhibit any symptoms of any infection that I should see him
> immediately because I could lose my vision permanently, partially, and they had
> prior knowledge to this and instead of recommending treatment for me when I seen
> them at the med line they refused to recommend treatment or to start the process in
> order for me to receive medical assistance.

*Id*.  Smith stated that R.N. Leland knew his medical history because he told Leland several times

when he picked contact solution and steroid eye drops.  *Id*.

   With respect to the time frame of August 10, 2018 through August 15, 2018, Smith

acknowledged that "I refused all of my medications."  *Id*. at PageID.556.  Based on other evidence,

Smith's method of refusing medication did not involve waiting in line.  In a separately filed

declaration, Smith explained that refusing medication lets him cut in line and return to his cell, *i.e.*,

"it is common practice that if a prisoner wishes to refuse his med's that prisoner refuse it [sic] from

the officer at the desk/post allowing 'cutting the line' for this purpose then return to his cell."

Smith Declaration (ECF No. 99-3, PageID.673).

   When asked to explain how R.N. Leland was deliberately indifferent to his medical

needs, Smith testified that Leland had "prior knowledge .  .  .  He had knowledge that I had a

serious medical need and he deliberately and indifferently refused to give me treatment for it

because me and his friend had an argument and I cussed her out."  Smith Dep. at PageID.558.

When asked about his deliberate indifference claim against R.N. Spear, Smith answered "[s]ame

thing."  *Id*.

As discussed, Smith's response to the motion for summary judgment included a declaration.  This document recited many of the facts alleged in the operative amended complaint. *See* Smith Decl. at PageID.675-680.[3]  In the declaration, Smith stated that he "did show nurses that plaintiff was in serious need of emergency medical care for more than three (3) days." *Id*. at PageID.674-675. Smith stated that each time he requested emergency medical care, "both nurses failed to properly act and did not provide basic fundamental help to prevent or correct plaintiff [sic] serious medical need." *Id*. at PageID.675.  While Smith has referred to his condition as a medical emergency lasting five or six days (*i.e.*, "between 8-10-18 and 8-15-18"), Smith stated in his declaration that he "informed nurse Spear and nurse Leland on several occasions that plaintiff *possibly* had a staph infection and corneal ulcer." *Id*. at PageID.674 (emphasis added).

With respect to his emergency visit to the Kellogg Eye Center, Smith stated that "[o]n 8-15-18 plaintiff awoke blind in his right eye and in severe desperation for medical care, refused to go in his cell until he got medical attention." *Id*. at PageID.678. This statement is blatantly inconsistent with the medical records.  As discussed, Smith did not demonstrate a "severe desperation for medical care;" rather, Smith initially refused treatment.

In his declaration, Smith acknowledged that the "I-Unit med-line is not a [sic] appointment for general health services." *Id*. at PageID.679.  Nevertheless, Smith states his conclusion that "once plaintiff made defendants aware of his medical emergency defendants was suppose [sic] to alert the doctors to resolve plaintiff condition which defendant [sic] did not do." *Id*.

---

[3] The Court notes that Smith also attached a copy of a (third) amended and "verified" complaint (ECF Nos. 56-1 and 99-2).  The Court denied Smith's motion to file this (third) amended complaint. *See* Order (ECF No. 95, PageID.624-625).  Furthermore, the proposed (third) amended complaint was not properly verified under 28 U.S.C. § 1746, being based on Smith's "personal knowledge, information and belief" (PageID.671).  Smith's operative (first) amended complaint (ECF No. 26, PageID.219) had the same defective verification.

Based on this record, it is undisputed that Smith experienced a medical emergency on August 15, 2018.  However, Smith has failed to demonstrate the subjective component of an 8th Amendment claim against defendants.  It is unclear whether Smith is claiming that defendants failed to treat an eye infection presented to them, or delayed in treating an eye infection which led to a medical emergency.  In either event, Smith's claim fails.

The gist of Smith's claim is that he visited the medication line over a period of several days to refuse his medicine, that defendants observed his eye while he refused medicine, that he asked defendants for medical assistance, that defendants refused his request because Smith had cussed out LPN Page, and that defendants' deliberate indifference caused Smith to suffer from an untreated eye infection for three to five days.

As an initial matter, it is undisputed that defendants R.N. Spear and R.N. Leland did not work on August 14th, the date which Smith alleged that he presented with his most serious eye problems and that the defendants ignored him.  Smith's declaration in response to the motion for summary judgment omits this most serious claim, which leads the Court to conclude that this allegation is unsupported by any evidence and frivolous.

Next, defendants were nurses responsible for dispensing medication.  They were not doctors treating Smith or other prisoners in a clinical setting.  Both R.N. Spears and R.N. Leland stated that any deviation in the routine process of the medication line could create a safety and security risk in the facility, as it would divert staff's attention and slow down medication distribution.  Spear Aff. at PageID.569-570;  Leland Aff. at PageID.574-575. As defendants stated, "[t]here is a lack of privacy, and the I-unit  medication line does not afford staff the opportunity to spend time with inmates, assess their medical needs, or address any issues they may be having,

beyond directing them to health care." *Id.* Smith was well aware of this situation, acknowledging in his declaration that the medication line "is not a[n] appointment for general health services."

Viewing the facts in the light most favorable to the non-moving plaintiff Smith, the evidence established: that Smith interacted with defendants on three days, August 11 through August 13, 2018; that on these days Smith was suffering from a medical emergency; that Smith cut in line to refuse medication; that Smith used this opportunity to ask defendants for medical assistance through the medication line window; and, that Smith knew that the medication line is not an appointment for general health services. Based these facts, Smith has failed to demonstrate that defendants were deliberately indifferent to his serious medical needs. Specifically, Smith sought treatment from defendants while they were dispensing medication, Smith knew defendants could not provide him treatment at that time, and Smith took no steps to seek treatment under the normal procedure by filing a Health Care Request (CHJ-549). Based on these facts, the Court concludes that defendants did not exhibit obduracy, wantonness or a mental state equivalent to criminal recklessness while performing their duties at the medication line on August 11, 12 and 13, 2018. *See Whitley*, 475 U.S. at 319; *Santiago*, 734 F.3d at 591. *See also, Pinkston v. Madry*, 440 F.3d 879, 892 (7th Cir. 2006) (affirming judgment in favor of medical personnel on an inmate's claim of deliberate indifference, where the inmate was the sole cause of delay in treatment); *Palmer v. Wagner*, 3 Fed. Appx. 329, 331 (6th Cir. 2001) (a voluntary refusal of treatment precludes an Eighth Amendment claim). Accordingly, defendants' motion for summary judgment should be granted as to Smith's 8th Amendment claim.[4]

---

[4] The Court notes that defendants have included an alternative claim for qualified immunity. *See* Defendants' Brief (ECF No. 90, PageID.543-545). Under this affirmative defense, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Having determined that defendants did not violate Smith's constitutional rights, it is unnecessary to address defendants' alternative theory of qualified immunity.

### III.    State law claims for gross negligence and medical malpractice

Smith's remaining claims of "gross negligence" and medical malpractice involve alleged violations of Michigan state law.  Here, the Court exercised its supplemental jurisdiction over Smith's state law claims pursuant to 28 U.S.C. § 1367, presumably because those claims were intimately related to the alleged § 1983 violations.  *See* 28 U.S.C. § 1367(a) ("the district court shall have supplemental jurisdiction over all other claims that are so related to the claims in the action within such original jurisdiction that they form a part of the same case or controversy").  The dismissal of Smith's federal claims against defendants, however, requires the Court to re-examine the issue of supplemental jurisdiction for state law claims against these defendants.  Under 28 U.S.C. § 1367(c)(3), a  district court may decline to exercise supplemental jurisdiction over a claim if the court "has dismissed all claims over which it has original jurisdiction."  Thus, once a court has dismissed a plaintiff's federal claim, the court must determine whether to exercise, or not to exercise, its supplemental jurisdiction under § 1367.  *See Campanella v. Commerce Exchange Bank*, 137 F.3d 885, 892-893 (6th Cir. 1998).  As a general rule "[w]hen all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims."  *Musson Theatrical, Inc. v. Federal Express Corp.*, 89 F.3d 1244, 1254-1255 (6th Cir. 1996).  Here, the Court has rejected Smith's federal claims.  There is no reason to retain supplemental jurisdiction over Smith's state law claims.  Accordingly, the Court should dismiss the state law claims asserted against defendants.

### IV.    Recommendation

Accordingly, I respectfully recommend that defendants' motion for summary judgment (ECF No. 89) be **GRANTED**, that Smith's state law claims be **DISMISSED** pursuant to 28 U.S.C. § 1367(c)(3), and that this action be **TERMINATED**.

Date:  August 26, 2021                              /s/ Ray Kent
                                                    _____
                                                    Ray Kent
                                                    United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report.  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order.  *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).